

# In The
# Court of Appeals
# Sixth Appellate District of Texas at Texarkana

No. 06-18-00114-CV

IN THE INTEREST OF D.C. AND E.C.-B., CHILDREN

On Appeal from the 336th District Court
Fannin County, Texas
Trial Court No. FA-17-43182

Before Morriss, C.J., Burgess and Stevens, JJ.
Memorandum Opinion by Chief Justice Morriss

# MEMORANDUM OPINION

Judy appeals the termination of her parental rights to her children, Dora and Ethan,[1] rendered on the petition of the Texas Department of Family and Protective Services (Department). The termination of Judy's parental rights was based on findings by the trial court: (A) that she knowingly placed or allowed Dora and Ethan to remain in conditions or surroundings which endangered their physical or emotional well-being; (B) that she engaged in conduct or knowingly placed the children with persons who engaged in conduct which endangered the children's physical or emotional well-being; (C) that she failed to comply with the provisions of a court order that specifically established the actions necessary for her to obtain the return of Dora and Ethan, who had been in the permanent or temporary managing conservatorship of the Department for not less than nine months as a result of their removal from her under Chapter 262 for abuse or neglect; and (D) that termination of her parental rights was in the children's best interest.[2] *See* TEX. FAM. CODE ANN. §161.001(b)(1)(D), (E), (O), (2) (Supp.).

On appeal, Judy argues that the evidence is legally and factually insufficient to support the four findings listed above, that the trial court erred in admitting allegedly undisclosed evidence, and that the jury was erroneously overextended by being required "to continue to hear evidence for well over 12 hours and when it was clearly apparent that the jury was beyond their ability to retain information."

---

[1] To protect the confidentiality of the children involved, this Court will refer to all involved parties by fictitious names. *See* TEX. R. APP. P. 9.8(b)(2).

[2] A Fannin County jury found that Judy's parental rights should be terminated as to Ethan, but was not asked to determine whether her parental rights to Dora should be terminated. Thus, the trial court was the fact-finder with respect to Judy's parental rights to Dora.

We conclude that (1) the trial court's termination findings were based on sufficient evidence, (2) the trial court did not abuse its discretion in admitting the challenged evidence, and (3) Judy failed to preserve for our review her complaint of jury overexertion. Accordingly, we affirm the trial court's judgment.

*(1)      The Trial Court's Termination Findings Were Based on Sufficient Evidence*

"The natural right existing between parents and their children is of constitutional dimensions." *Holick v. Smith*, 685 S.W.2d 18, 20 (Tex. 1985). Indeed, parents have a fundamental right to make decisions concerning "the care, custody, and control of their children." *Troxel v. Granville*, 530 U.S. 57, 65 (2000). "Because the termination of parental rights implicates fundamental interests, a higher standard of proof—clear and convincing evidence—is required at trial." *In re A.B.*, 437 S.W.3d 498, 502 (Tex. 2014). This Court is therefore required to "engage in an exacting review of the entire record to determine if the evidence is . . . sufficient to support the termination of parental rights." *Id*. at 500. "[I]nvoluntary termination statutes are strictly construed in favor of the parent." *In re S.K.A.*, 236 S.W.3d 875, 900 (Tex. App.—Texarkana 2007, pet. denied) (quoting *Holick*, 685 S.W.2d at 20).

To terminate parental rights, the trial court must find, by clear and convincing evidence, that the parent has engaged in at least one statutory ground for termination and that termination is in the child's best interest. TEX. FAM. CODE ANN. § 161.001 (Supp.); *In re E.N.C.*, 384 S.W.3d 796, 798 (Tex. 2012). "Clear and convincing evidence" is that "degree of proof that will produce in the mind of the trier of fact a firm belief or conviction as to the truth of the allegations sought

3

to be established." TEX. FAM. CODE ANN. § 101.007; *see In re J.O.A.*, 283 S.W.3d 336, 344 (Tex. 2009). This standard of proof necessarily affects our review of the evidence.

In our legal sufficiency review, we consider all the evidence in the light most favorable to the findings to determine whether the fact-finder reasonably could have formed a firm belief or conviction that the grounds for termination were proven. *In re J.P.B.*, 180 S.W.3d 570, 573 (Tex. 2005) (per curiam); *In re J.L.B.*, 349 S.W.3d 836, 846 (Tex. App.—Texarkana 2011, no pet.). We assume the fact-finder resolved disputed facts in favor of the finding, if a reasonable fact-finder could do so, and disregarded evidence that the fact-finder could have reasonably disbelieved or the credibility of which reasonably could be doubted. *J.P.B.*, 180 S.W.3d at 573.

In our review of factual sufficiency, we give due consideration to evidence the fact-finder could have reasonably found to be clear and convincing. *In re H.R.M.*, 209 S.W.3d 105, 109 (Tex. 2006) (per curiam). We consider only that evidence and determine "whether [it] is such that a fact[-]finder could reasonably form a firm belief or conviction about the truth of the . . . allegations." *Id.* at 108 (quoting *In re C.H.*, 89 S.W.3d 17, 25 (Tex. 2002)); *In re J.F.C.*, 96 S.W.3d 256, 264, 266 (Tex. 2002). "If, in light of the entire record, the disputed evidence that a reasonable fact[-]finder could not have credited in favor of the finding is so significant that a fact[-]finder could not reasonably have formed a firm belief or conviction, then the evidence is factually insufficient." *J.F.C.*, 96 S.W.3d at 266. "[I]n making this determination, [we] must undertake 'an exacting review of the entire record with a healthy regard for the constitutional interests at stake.'" *A.B.*, 437 S.W.3d at 503 (quoting *C.H.*, 89 S.W.3d at 26).

4

Despite the profound constitutional interests at stake in a proceeding to terminate parental rights, "the rights of natural parents are not absolute; protection of the child is paramount." *In re A.V.*, 113 S.W.3d 355, 361 (Tex. 2003) (quoting *In re J.W.T.*, 872 S.W.2d 189, 195 (Tex. 1994)); *see In re M.S.*, 115 S.W.3d 534, 547 (Tex. 2003). "A child's emotional and physical interests must not be sacrificed merely to preserve parental rights." *In re C.A.J.*, 459 S.W.3d 175, 179 (Tex. App.—Texarkana 2015, no pet.) (citing *C.H.*, 89 S.W.3d at 26).

"To affirm a termination judgment on appeal, a court need uphold only one termination ground—in addition to upholding a challenged best interest finding—even if the trial court based the termination on more than one ground." *In re N.G.*, No. 18-0508, 2019 WL 2147263, at *1 (Tex. May 17, 2019) (per curiam); *see In re O.R.F.*, 417 S.W.3d 24, 37 (Tex. App.—Texarkana 2013, pet. denied) (citing *A.V.*, 113 S.W.3d at 362; *In re K.W.*, 335 S.W.3d 767, 769 (Tex. App.—Texarkana 2011, no pet.); *In re N.R.*, 101 S.W.3d 771, 775 (Tex. App.—Texarkana 2003, no pet.)). However, due process demands that we also review the evidence supporting findings under Grounds D and E when they are challenged on appeal because termination of parental rights under these Grounds "may have implications for . . . parental rights to other children." *N.G.*, 2019 WL 2147263, at *2, 3. Therefore, we begin with Grounds D and E.

a.      *The Evidence at Trial*

Judy lived with her fiancée, Craig, and her children, sixteen-year-old Jack, fifteen-year-old Dora, and six-year-old Ethan.[3]   Shatera Gunn, an investigator with Child Protective Services

---

[3]While this case was pending, Judy gave birth to another child, Tommy.  Judy testified that all her children had different fathers.

(CPS), testified that this case began when Dora made an outcry of sexual abuse against Jack, who was already on community supervision for assaulting Judy. Dora told Gunn that she was asleep on the couch and "woke up with her pants and panties pulled down to her ankle and her bra unbuckled" next to Jack, who was sitting on the couch awake. Dora said that Jack was the only person in the room and, while she was uncertain, she "felt like [Jack] had rubbed her thigh." Dora testified that Jack offered to do her chores if she kept the incident secret.

According to Gunn, Judy and Dora's aunt did not believe the outcry and claimed the child had a history of lying and made the allegation up because she was upset at being punished for making bad grades in school and wanted to get someone else in trouble. Gunn testified that, although there was not enough evidence to criminally charge Jack with sexual assault, Dora never wavered from her version of the alleged assault.

Judy admitted that she sometimes left the children home alone and that Jack, Dora, and Ethan were home alone when Dora alleged Jack had unclothed her. Judy testified that she believed Dora was lying about the accusation because, although she had cried after the incident, she was "laughing and giggling and trying to get the attention of everyone around her" at the hospital. According to Judy, Dora claimed Jack had "raped" her, but said the next day "that it didn't happen, that she was mad at [Judy]." Judy testified that one of Dora's counselors had also reported that Dora recanted her allegation and that Dora tended to lie. During cross-examination, Judy admitted the possibility that Jack had engaged in inappropriate activities with the children when they were left alone and admitted that Beatrice, Dora, and Ethan were all afraid of Jack.

Kassi Lightfoot, the program director of the Fannin County Children's Advocacy Center (CAC), testified regarding a CAC forensic interview she had conducted with Dora and Ethan. Lightfoot said Judy refused her request to stay after Dora's interview, yelled at her, and fled the CAC with Dora. Lightfoot was concerned about Dora's safety because Judy was returning Dora home after Lightfoot explained it was unsafe for her to remain in the house with Jack given the allegation.

Gunn testified that a prior CPS case was already pending against Judy when the decision was made to remove Dora from the home while investigating her outcry. After the removal, Gunn said that Dora was physically attacked by Jack while they were at school. When asked about the attack, Judy said it was Dora's fault because "[s]he was picking on him at school, telling people that he had raped her."[4] Dora had a black eye, said it was due to a medical condition, and denied that it was a result of Jack's assault at school. According to Gunn, Jack's teacher reportedly witnessed the incident and saw Jack hit Dora in the face.

Gunn testified that Judy had a prior CPS history, which began in 2004 when Jack's former caretaker called CPS to report that Jack was living with him, not Judy, and that he could no longer care for the child.[5] In 2007, CPS received a report of neglectful supervision and physical abuse of Jack, who said he wished to leave Judy's home. CPS records from that time showed that Jack was an aggressive child and spoke of hurting animals. In 2008, marihuana use in the home was reported. In 2009, Dora had a black eye, said her parents were not nice and did not take care of

[4]Gunn clarified that Dora never told CPS she was raped.

[5]Gunn testified that, in 2004, CPS determined there was reason to believe that Jack was being physically neglected by the caretaker.

her, complained of being hungry, and reported that she had to do her homework in the dark. That same year, Jack went to school with a large bruise on his back. Despite the reports, Gunn concluded that the allegations could not be established as true or had been ruled out.

In 2010, Jack was placed in a mental health center and claimed to be fearful of Judy. According to Judy, Jack had stabbed her many times before he was placed on medication as a result of mental health treatment. The family moved to North Carolina in 2010, where they were also investigated by local CPS four times over the course of several years. They returned to Texas in 2015 and were offered family-based services the following year in the hope of keeping the family unit intact. Gunn testified that, by this time, Jack was on medication for schizophrenia, and the family home was occupied by Judy, Jack, Dora, Ethan, Judy's seventeen-year-old daughter Beatrice, a man named Randall Lee Jones, and a family friend, Benjamin James Cowling.[6]

Judy testified that Beatrice and Dora made the following allegations against Jack: that he had punched a hole in the bathroom wall and "was peeking in the bathroom at them." Judy claimed the allegations were motivated by jealousy of her relationship with Jack and by their desire to remove him from the home. In August 2016, police officers responded to the home on a report of a physical altercation between Judy and Jack, who were biting and slapping each other. Jack claimed he was trying to protect Ethan during the event, but Judy testified that Jack punched her in the eye after she blocked his exit from the home. Gunn testified that Jack was violent, exhibited homicidal behavior, and admitted he heard voices telling him to kill random people.

---

[6]By the time of trial, Jack had also been diagnosed with attention deficit hyperactivity disorder and oppositional defiant disorder.

8

Gunn's investigation revealed that Judy had a criminal history that included causing bodily injury, assault of a public servant, resisting arrest, failure to identify, unauthorized use of a motor vehicle, two burglaries, and two thefts. Craig also had a criminal history of burglary, theft, unauthorized use of a vehicle, and possession of a controlled substance. The investigation also showed Judy was assaulted by Ethan's father while she was pregnant with Ethan. Judy admitted that, after Ethan was born, she and Ethan's father both engaged in family violence assault in front of the children and that she left him after he threatened to kill her in front of Ethan. According to Judy, emotional abuse occurred daily, and physical abuse occurred "[p]robably once a month."

Judy established at trial that her prior CPS history resulted from her own requests for assistance from CPS in dealing with Jack's mental health. Nevertheless, based on her review of the family's history, Gunn concluded that Judy was not protective of Dora and Ethan, but attempted to reunite the family following Dora's removal. The attempt failed when Judy refused to sign a family safety plan that would have allowed Dora and Ethan's return to her home if she agreed (a) not to be with Dora unsupervised and (b) not to leave Ethan alone with Jack unsupervised. As a result, Ethan was also removed from Judy's home after law enforcement calmed Judy down several times in front of the child.

Cody Trauer, a CPS investigator, interviewed Ethan after Dora's removal. According to Trauer, Ethan said he was left at home alone and that the utilities in his home, including the toilet, occasionally did not work. Dora also told Trauer that the utilities in her home and the toilet sometimes did not work. Trauer's interview revealed that Ethan had witnessed Judy and his father verbally and physically fighting. The child described a physical altercation between Jack and

9

"Nana" involving a knife and told Trauer he was touched and kicked on his privates by someone in the home. In speaking of his past, Ethan testified that his North Carolina home made him sad because he remembered one incident when Judy and his father were fighting and pushing each other. He said Jack held him when he cried so he would not be afraid. Ethan also remembered that Jack had hit Judy. Gunn also testified that Ethan "mentioned some concerning things about sexual abuse in the home between he and [Jack]."

To investigate the possible sexual abuse, Ethan was examined by Lightfoot. Lightfoot, who noted marks and scratches on Ethan's arm during her interview, also testified that Ethan said he was grabbed and kicked in his "pee-pee" by Jack, but that some of his statements, including that his privates were blown up by a bomb, were "fantastical." Due to the lack of appropriate alternative placement, Dora and Ethan were placed into foster care.

Ethan was removed from his first foster home as a result of allegations that the foster parents were guilty of abuse. Ethan's second foster mother, identified in the record by only her first name, Brianna, testified that Ethan was placed in her home on July 24, 2017, and was doing well until he was visited by Dora. Brianna said that Dora was very "motherly" and protective of Ethan and requested that Brianna demonstrate that she had sufficient food for the child. Dora explained that she had suffered food shortage while in Judy's home and would go days without eating so that Ethan could eat.

According to Brianna, after Dora's visit, Ethan began struggling at school, slinging racial comments and "being mean to the other kids." Although Ethan had several successful visits with Judy before Dora's visit, Brianna testified Ethan began expressing fear of continued visits with

10

Judy and would complain of stomach aches, "make himself throw up," or try other tactics to prevent them. According to Stephanie Garcia, a Department conservatorship worker, Ethan said Judy made him nervous, and he was scared she would hit or yell at him. Brianna testified that she called CPS after Ethan reported that he had watched pornography with Jack and that Judy had "special slumber parties in her room [with Jack that] no one else was invited to."

CPS requested additional interviews of the child. Michael Jafarezadeh, a clinical psychologist, testified that he evaluated Ethan and determined that he was emotionally distressed, defiant, socially awkward, and potentially aggressive. Jafarezadeh testified Ethan had nightmares of Jack and feared him. He diagnosed Ethan with post-traumatic stress disorder (PTSD) caused by witnessing an act of physical or sexual violence, not by being uprooted from his family. Hannah Rupley-Ulbrich, a licensed professional counselor, testified that she was currently counseling Ethan, who reported he sometimes felt unloved, was scared of Jack, and had "dream[s] where things were happening to his private parts" that made him feel "yucky . . . and scared." Based on his reports, Rupley-Ulbrich determined it was "very possible" that Jack had sexually assaulted Ethan.

Ethan was admitted to a psychiatric hospital for inpatient treatment after he said he was hearing voices telling him to harm people. Brianna testified that Ethan was violent against her children and was not allowed to return to her home after she tore three ligaments when he kicked her, caused her to fall, and stepped on her ankle. As a result, Ethan was placed in another foster home.

Katie Murphy, Ethan's current foster mother, testified that she had just obtained special training to operate a therapeutic foster home when Ethan was placed with her. Murphy testified that Ethan calls her "Mom," refers to her husband as "Dad," and uses Judy's first name when addressing her.

Murphy testified that Ethan saw two individual counselors, attended family counseling, and visited with Judy every other week. Murphy described Ethan as verbally abusive and prone to temper tantrums when triggered, saying that they typically occurred after an unpleasant visit with Judy, CPS workers, or his court appointed special advocate (CASA). Murphy mirrored Brianna's testimony that Ethan was anxious about and tried several tactics to avoid visiting with Judy. He became upset when he discovered Judy had failed to inform him that she gave birth to Tommy during the pendency of this case. CASA volunteer, Michelle Hoops, testified that Ethan enjoyed his visits with Judy, but had a hard time with them. Hoops said Ethan was happy in his current placement, had bonded with his foster parents, and played well with their children.

Judy testified that she loved Dora and Ethan, had good visits with them regularly, and had completed all requirements of her family service plan. Judy also said that Ethan loved her, wanted to return home to her, and would be emotionally harmed if he could never see her again. Judy said that Jack, who was seventeen at the time of trial, was bouncing between living with Judy's uncle's ex-wife and another one of Judy's cousins in Euless, Texas. Thus, because Jack was no longer in the home, she wished for Ethan to come live with her in her Leonard, Texas, home with Tommy, Beatrice, and Beatrice's child, who was born to Beatrice after Judy allowed her to date and move in with her twenty-five-year-old boyfriend before her eighteenth birthday. Judy believed it was in

Ethan's best interests to live with her and testified that Ethan was excited about and had bonded with his new brother, Tommy.

Judy, who had abandoned her schooling in the tenth grade after becoming pregnant with Beatrice, worked as a nursing assistant. As a result of her work, Judy testified that Craig had watched the children while she was away. Judy admitted that Craig tested positive for drugs in October 2017 during the pendency of the case, and Dora testified she was concerned about Craig's drug use. Yet, Judy ignored CPS's demands that Craig be removed from the home, and he tested positive again for heroin in January 2018. Trauer testified he also investigated allegations that Craig was using marihuana while taking care of Tommy in Judy's home. According to Trauer, Judy said she was no longer in a relationship with Craig, who had been in a residential drug rehabilitation facility in Dallas since March, before the allegation was reported. After Trauer found the home appropriate, he determined that allegation was unfounded.

While the case was pending, Judy signed an affidavit voluntarily relinquishing her parental rights to Dora, who was sixteen at the time of trial. Dora testified she had a bad relationship with Jack, who would hit her "just a little bit," leaving bruises on her body. Dora did not feel safe around Jack. Dora said that she took care of Ethan while they lived with Judy. Specifically, she woke and dressed him for school in the morning, fed and bathed him, and put him to bed. Garcia testified that Judy was not able to meet Ethan's emotional or physical needs and that it was in the child's best interests that her parental rights be terminated. Hoops agreed with Garcia's recommendation. Dora testified that she loved Judy and enjoyed visiting with her, but wished to be adopted, ideally with Ethan.

13

However, Murphy testified that Ethan loved his mother, wanted to live with her, and would be devastated if he was not able to see her again.[7] Ethan testified that his foster home was "[a] little bad," that one of his foster brothers was "cuckoo" and he did not like sharing a room with him, and that it was a house with "drama queens." Murphy clarified that she did not intend on adopting him.

The bond Ethan shared with Judy was confirmed by several counselors. According to Jafarezadeh, Ethan enjoyed seeing Judy. In unpacking his feelings, Ethan told Rupley-Ulbrich he missed and wanted to see Judy, but feared she would be angry with and hurt him, though she never had. According to Rupley-Ulbrich, Ethan wanted to go home with Judy.

In testifying for the jury, Ethan described Judy as his "real mom" and testified that he enjoyed visiting with Judy, Beatrice, and Dora. Ethan said his mom was never mean and did not remember saying he was ever scared of her. Although he did not want to live in a house with Jack, who he described as mean, Ethan testified it would make him sad if he did not see him. Ethan wished to live with Dora and gave conflicting answers on whether he wanted to live with Judy.[8] However, it was clear that Ethan wished to visit with Judy often. Ethan said Judy was nice to him, that she "always loves" him, and that he "really miss[ed] her." Ethan also missed his sisters and

---

[7]According to Murphy, although one of Ethan's counselors said the child was not fully comfortable that Judy could care for him, the child missed her and wanted to go home to her.

[8]Ethan initially testified that he did not want to live with Judy. When asked why, Ethan replied, "I don't want to get cut with something -- with knives," but clarified that he had not been cut before but had hooked himself with a fishing hook by accident. Although he later said he wanted to live with Dora and Judy, he said there was a "bad chance" of that happening because "[Dora] won't go to -- to [Judy's] house and I won't go to [Judy's] house." Yet, he also said his favorite thing about Judy was "[l]iving with her" and that he wanted to live with her for all his life.

14

said he missed Jack the most, even though he was not nice to him. Ethan wanted his "old family" and said it would make him sad if he was unable to see them.

Elizabeth Mbula Wasonga testified that she counseled Ethan and Judy, that the two loved each other, and that Ethan did not appear scared of Judy. Instead, Ethan told Wasonga that he was afraid of Murphy and her husband who "would pin him on the wall" as a form of discipline. Wasonga testified that Judy attended every scheduled counseling session, Ethan always had a gift for her, and he was visibly sad when the sessions were over. Wasonga also testified Ethan wanted to go home to his mother and would be negatively affected if he was unable to be with her. According to Wasonga, Judy had the parental skills to enable a successful reunification with Ethan.

Yet, the Department questioned Judy's parenting skills. According to Garcia, there was a note in the file stating Judy "got mad at [Ethan] for throwing a fit and left the visit and told him she was leaving because she was tired of him throwing fits in every visit."[9] The evidence showed that Ethan needed academic assistance and that his school requested that he be held back one grade, but Judy refused to allow the retention. His foster parents agreed to allow the school to reenter Ethan in kindergarten, and Judy admitted that the child's academic work had improved.

Garcia testified that the Department was looking to potentially place Ethan with a couple in their fifties who had not met the child. Judy said, and the evidence showed, that the Department had tried, but failed, to find Ethan a permanent placement. On this evidence, the question of whether to terminate Judy's parental rights was presented to the jury. In accordance with the jury's

---

[9]Wasonga testified she only witnessed one tantrum by Ethan during all of their family therapy sessions.

15

verdict as to Ethan and the trial court's findings with respect to Dora, the trial court terminated Judy's parental rights to both children.

      *b.*        *Sufficient Evidence Supports the Ground D Finding*

"Under Ground D, the trial court may terminate a person's parental rights if it finds that the parent 'knowingly placed or knowingly allowed the child[ren] to remain in conditions or surroundings which endanger[ed] the physical or emotional well-being of the child[ren].'" *In re E.M.*, No. 06-17-00083-CV, 2017 WL 5586633, at *4 (Tex. App.—Texarkana Nov. 21, 2017, no pet.) (mem. op.) (alteration in original) (quoting TEX. FAM. CODE ANN. § 161.001(b)(1)(D)). "In making that determination, 'we must examine the time before the [child]'s removal to determine whether the environment [of the home] posed a danger to the child's physical or emotional well-being.'" *Id.* (alteration in original) (quoting *In re L.E.S.*, 471 S.W.3d 915, 925 (Tex. App.—Texarkana 2015, no pet.).

Endanger "means more than a threat of metaphysical injury or potential ill effects of a less-than-ideal family environment." *E.N.C.*, 384 S.W.3d at 803. It "means to expose to loss or injury." *In re N.S.G.*, 235 S.W.3d 358, 367 (Tex. App.—Texarkana 2007, no pet.) (citing *Tex. Dep't of Human Servs. v. Boyd*, 727 S.W.2d 531, 533 (Tex. 1987)). "[A] parent need not know for certain that the child is in an endangering environment; awareness of such a potential is sufficient." *E.M.*, 2017 WL 5586633, at *4 (quoting *In re S.M.L.*, 171 S.W.3d 472, 477 (Tex. App.—Houston [14th Dist.] 2005, no pet.)). "A child is endangered when the environment creates a potential for danger that the parent is aware of, but disregards." *Id.* (quoting *L.E.S.*, 471 S.W.3d at 925).

16

"The child does not have to suffer actual injury." *Id.* at \*5. "Rather, it is sufficient that the child's well-being be jeopardized or exposed to loss or injury." *Id.* (quoting *In re C.L.C.*, 119 S.W.3d 382, 392 (Tex. App.—Tyler 2003, no pet.)). Under this Ground, "parental rights may be terminated based on a single act or omission by the parent." *Id.* (citing *L.E.S.*, 471 S.W.3d at 925)).

"[A]busive or violent conduct by a parent or other resident of a child's home can produce an environment that endangers the physical or emotional well-being of a child." *Id.* (quoting *In re B.E.T.*, No. 06-14-00069-CV, 2015 WL 495303, at \*5 (Tex. App.—Texarkana Feb. 5, 2015, no pet.) (mem. op.)). The evidence established that the children had witnessed physical abuse between Judy and Ethan's father, that Judy and Jack assaulted each other, and that Ethan had seen Jack wielding a knife to attack someone. In addition to the allegation that Jack had undressed her, Dora testified she was physically abused by Jack. Judy knew of Jack's violent nature, testified that Jack tried to stab her many times, and admitted that Beatrice, Dora, and Ethan were afraid of Jack. Ethan's counselors relayed the child's fear of Jack and his reports that Jack had inappropriately touched Ethan's privates, causing him pain. Even though Judy knew Jack was dangerous, she testified that she left her other children home alone with him.[10] We conclude that these facts are legally and factually sufficient to support the Ground D findings as to Dora and Ethan.

---

[10]Evidence also showed that Craig, who sometimes cared for the children, had issues with illegal drug use and that his drug use concerned Dora. Illegal drug use by a caretaker can support the conclusion that the children's surroundings endanger their physical or emotional well-being. *See In re J.L.G.*, No. 06-16-00087-CV, 2017 WL 1290895, at \*7 (Tex. App.—Texarkana Apr. 6, 2017, no pet.) (mem. op.) (citing *In re J.T.G.*, 121 S.W.3d 117, 125 (Tex. App.—Fort Worth 2003, no pet.)).

17

*c.*      *Sufficient Evidence Supports the Ground E Finding*

The Department alleged that Judy engaged in conduct or knowingly placed Dora and Ethan with persons who engaged in conduct which endangered their physical or emotional well-being. *See* TEX. FAM. CODE ANN. § 161.001(b)(1)(E). "Ground E 'refers only to the parent's conduct, as evidenced not only by the parent's acts, but also by the parent's omissions or failures to act.'" *N.S.G.*, 235 S.W.3d at 366–67 (quoting *In re S.K.*, 198 S.W.3d 899, 902 (Tex. App.—Dallas 2006, pet. denied)). "The conduct to be examined includes what the parent did both before and after the child was born." *Id.* at 367; *see E.N.C.*, 384 S.W.3d at 804–05. "To be relevant, the conduct does not have to have been directed at the child, nor must actual harm result to the child from the conduct." *Perez v. Tex. Dep't of Protective & Regulatory Servs.*, 148 S.W.3d 427, 436 (Tex. App.—El Paso 2004, no pet.) (citing *Dupree v. Tex. Dep't of Protective & Regulatory Servs.*, 907 S.W.2d 81, 84 (Tex. App.—Dallas 1995, no writ)); *see E.N.C.*, 384 S.W.3d at 803; *N.S.G.*, 235 S.W.3d at 367. Rather, "[u]nder subsection (E), it is sufficient that the child's well-being is jeopardized or exposed to loss or injury." *In re L.E.S.*, 471 S.W.3d 915, 923 (Tex. App.— Texarkana 2015, no pet.). However, termination under this ground "must be based on more than a single act or omission; a voluntary, deliberate, and conscious course of conduct by the parent is required." *Perez*, 148 S.W.3d at 436 (citing *In re K.M.M.*, 993 S.W.2d 225, 228 (Tex. App.— Eastland 1999, no pet.)); *see Tex. Dep't of Human Servs. v. Boyd*, 727 S.W.2d 531, 533 (Tex. 1987); *N.S.G.*, 235 S.W.3d at 367.

Judy testified that she was physically abused by Ethan's father during her pregnancy with Ethan, which placed the child in physical danger. She also admitted that they both engaged in

18

emotional and physical abuse in front of the children. "[A] parent's abuse of the other parent or children can support a finding of endangerment." *In re E.J.Z.*, 547 S.W.3d 339, 350 (Tex. App.—Texarkana 2018, no pet.) (quoting *In re D.O.*, 338 S.W.3d 29, 34 (Tex. App.—Eastland 2011, no pet.)). Though the children were not always present to see the abuse between Judy and Ethan's father, "[a] fact-finder 'can consider the history of abuse between the mother and the father for purposes of subsection . . . (E), even if the children are not always present.'" *In re Z.M.*, 456 S.W.3d 677, 686 (Tex. App.—Texarkana 2015, no pet.) (quoting *In re A.V.M.*, No. 13-12-00684-CV, 2013 WL 1932887, at *5 (Tex. App.—Corpus Christi May 9, 2013, pet. denied) (mem. op.)).

As described above, the evidence showed that Judy fought with Jack and knew the child was violent and that his siblings were afraid of him, but left him alone with them. Jack attacked Dora at school in front of witnesses while Ethan was still living in Judy's home. Judy, who chose not to believe Dora's outcry, blamed Dora for Jack's physical assault and accused her of picking on him. Even though Beatrice and Dora reported that, as they used the restroom and showered, Jack was watching them through the hole he had punched in the wall, Judy disbelieved their accusations and claimed they were fabricated because Beatrice and Dora were jealous of the time Judy spent with Jack. Against Lightfoot's warnings, Judy fled with Dora after her interview and returned her home to Jack, whom Dora had just accused of undressing her. This evidence showed that Judy was overly protective of Jack at the expense of her other children's protection.

Ethan reported fear of Judy, and the evidence showed he experienced anxiety before his visits with her. Ethan was emotionally distressed, defiant, socially awkward, potentially aggressive, and experienced PTSD from events occurring while living with Judy. Jafarezadeh and

19

Rupley-Ulbrich testified that the child had nightmares of Jack and feared him. Although the Department was prepared to return Ethan if Judy agreed not to leave him unsupervised with Jack, Judy refused the offer.

The Department's witnesses testified that Judy had a history of neglecting the children or leaving them with inappropriate caretakers. Judy had previously left Jack in the care of a man who was unable to care for, and neglected, Jack's physical needs and allowed Beatrice to move in with a twenty-five-year-old man while she was only a minor. Dora testified that she went without food for days while in Judy's care, and both Dora and Ethan claimed their utilities, including their toilet, did not always work. Due to her work schedule, Judy either left the children alone or in Craig's care. Even though Craig tested positive for drugs during the pendency of the case, Judy allowed him to remain in the home despite the Department's protests, gave birth to his child, Tommy, and secreted her pregnancy and Tommy's birth from her other children and the Department. Three to four months after the first failed drug test, Craig tested positive for heroin while living with Judy. Judy voluntarily relinquished her parental rights to Dora, who was concerned about Craig's drug use.

While it is true that there was evidence that Judy loved Dora and Ethan, the evidence also established that Judy's home was a tumultuous one. The evidence showed that Judy had a history of enduring and perpetrating physical abuse, failed to consistently provide for her children's needs, did not provide for their safety from Jack, and tolerated drug use by a caretaker who lived in her home. "In termination cases, '[w]hen there is conflicting evidence, it is the province of the trier of fact to resolve such conflicts.'" *Z.M.*, 456 S.W.3d at 688 (quoting *Jordan v. Dossey*, 325 S.W.3d

20

700, 713 (Tex. App.—Houston [1st Dist.] 2010, pet. denied)). Based on all the evidence introduced in this case, we conclude that a rational fact-finder could readily have reached the necessary firm conviction or belief that Judy engaged in conduct or knowingly placed Dora and Ethan with persons who engaged in conduct which endangered their physical or emotional well-being. Accordingly, we find the evidence legally and factually sufficient to support the fact-finder's Ground E findings.[11]

> d.      *Sufficient Evidence Supports the Best-Interest Findings*

"There is a strong presumption that keeping a child with a parent is in the child's best interest." *In re L.G.*, No. 06-18-00099-CV, 2019 WL 1548925, at *6 (Tex. App.—Texarkana Apr. 10, 2019, no pet.) (quoting *In re J.A.S., Jr.*, No. 13-12-00612-CV, 2013 WL 782692, at *7 (Tex. App.—Corpus Christi Feb. 28, 2013, pet. denied) (mem. op.) (citing *In re R.R.*, 209 S.W.3d 112, 116 (Tex. 2006) (per curiam)). The termination of parental rights "can never be justified without the most solid and substantial reasons." *Id.* (quoting *In re N.L.D.*, 412 S.W.3d 810, 822 (Tex. App.—Texarkana 2013, no pet.)). "It is not sufficient to merely show that the child might be better off living elsewhere with more prosperous parents." *Id.* "In our best-interest analysis, we focus on the best interest of the child, not the best interest of the parent." *Id.*

Courts consider the following *Holley* factors in determining the best interests of the child:

(1) the desires of the child, (2) the emotional and physical needs of the child now and in the future, (3) the emotional and physical danger to the child now and in the future, (4) the parental abilities of the individuals seeking custody, (5) the programs available to assist these individuals, (6) the plans for the child by these individuals, (7) the stability of the home, (8) the acts or omissions of the parent that may indicate

---

[11]Because sufficient evidence supports Grounds D and E, we need not consider the trial court's Ground O finding.

21

the existing parent-child relationship is not a proper one, and (9) any excuse for the acts or omissions of the parent.

*Id.* at *7 (quoting *N.L.D.*, 412 S.W.3d at 818–19 (citing *Holley v. Adams*, 544 S.W.2d 367, 371–72 (Tex. 1976))); (citing TEX. FAM. CODE ANN. § 263.307(b) (Supp.); *E.N.C.*, 384 S.W.3d at 807). "It is not necessary to prove all of these factors as a condition precedent to parental[-rights] termination." *Id.* "In certain cases, evidence relating to one factor may be adequate to support a finding that termination is in the best interest of the child." *Id.* "A parent's inability to provide adequate care for a child, lack of parenting skills, and poor judgment may be considered when looking at the child's best interest." *Id.* (quoting *B.H.R.*, 535 S.W.3d at 123). "Further, evidence used to support the grounds for termination of parental rights may be considered in the best-interest analysis." *Id.*

With respect to Dora, ample evidence supported the best-interest finding in addition to the evidence previously recited under our analysis of Grounds D and E. Dora testified that she did not want to live with Judy and wished to be adopted by someone else. Although the Department offered to return Dora if Judy did not leave her unsupervised, Judy refused to accept the offer and chose instead to sign a voluntary relinquishment of her parental rights to the child.

A balancing of the *Holley* factors with respect to Ethan also leads us to conclude that the evidence was legally and factually sufficient to support the jury's best-interest finding, even though we find that the first, sixth, and seventh factors weigh against a finding of terminating Judy's parental rights. As to these factors, while Ethan gave some conflicting answers as to whether he wished to live with Judy, most of his answers indicated that he wanted to return to her. The overwhelming weight of the evidence showed that Judy and Ethan loved and were bonded to

22

each other and that Ethan would be devastated if he could not see his mother. The evidence at trial showed that the Department had failed at several attempts to place Ethan in a permanent home, that his current foster home did not suit the child and was only a temporary placement, and that there was no established plan for a permanent home for Ethan. In contrast, Judy testified that she wished for Ethan to reside with her, Beatrice, and Tommy in a home declared by Trauer as appropriate. Judy testified that neither Jack nor Craig were living with her. Judy added that she had completed all the classes required by the Department, had learned some hard lessons regarding her parenting, and assured the jury that she would not repeat her mistakes.

Yet, factors two through five and seven through nine supported the jury's verdict that Ethan's return to Judy was not in his best interests. The evidence showed that Judy's home was unstable and that Ethan had suffered PTSD from events occurring in the home. Given his PTSD, emotional distress, and defiance, Ethan had emotional needs requiring special care, which Judy had not properly attended to in the past. Although Judy was not currently living with Jack, who caused Ethan's distress, the jury could have found that Judy would again place him in emotional or physical danger by allowing Jack to visit Ethan because she (1) had failed to protect her children from Jack in the past and (2) had refused the Department's offer to return Ethan on the condition that she not allow Jack to visit him unsupervised.

Although Wasonga said Judy had the parenting skills to be reunited with Ethan, Judy refused Ethan's school's requests to hold him back one grade even though he needed academic assistance. When his foster parents agreed to the school's request, Judy admitted that it improved Ethan's academic performance. Although Judy had a long history of requesting and using

23

programs available through the Department to assist her, Judy's treatment of her other children spoke to her parenting skills. She had left them alone or with inappropriate caretakers, allowed the minor Beatrice to move in with a twenty-five-year-old man, and voluntarily relinquished her parental rights to Dora instead of agreeing to provide appropriate supervision for her. Her criminal history, apathy toward Dora's and Beatrice's accusations toward Jack, disregard of Lightfoot's advice not to take Dora back to her alleged perpetrator, failure to promptly remove a drug user from her home during the pendency of the case, and lack of an excuse for these acts and omissions demonstrated her poor judgment and lack of parenting skills.

We find that legally and factually sufficient evidence supported the findings that terminating Judy's parental rights was in Dora's and Ethan's best interests. Accordingly, we overrule Judy's evidentiary challenges.

*(2)*     *The Trial Court Did Not Abuse Its Discretion in Admitting the Challenged Evidence*

Judy also argues that the trial court erred in admitting a document labeled "Ad Litem 6," which was allegedly not received in discovery. "Under Rule 193.6 of the Texas Rules of Civil Procedure, when a party fails to timely supplement a discovery response, the untimely disclosed evidence may be excluded." *In re D.W.G.K.*, 558 S.W.3d 671, 679 (Tex. App.—Texarkana 2018, pet. denied) (citing TEX. R. CIV. P. 193.6(a); *Alvarado v. Farah Mfg. Co.*, 830 S.W.2d 911, 914 (Tex. 1992)). "Exclusion is mandatory and automatic unless the court finds that there was good cause for the failure to amend or supplement, or the failure will not unfairly surprise or prejudice the other party." *Id.* (citing TEX. R. CIV. P. 193.6(a); *Morrow v. H.E.B., Inc.*, 714 S.W.2d 297, 297–98 (Tex. 1986) (per curiam); *Good v. Baker*, 339 S.W.3d 260, 271 (Tex. App.—Texarkana

24

2011, pet. denied)). "The party seeking to introduce the evidence has the burden of establishing good cause or lack of unfair surprise or prejudice." *Id.* (citing TEX. R. CIV. P. 193.6(b); *Baker*, 339 S.W.3d at 271).[12]

"Although Rule 193.6 is applicable to all civil cases, parental-rights termination cases are unique among civil cases." *Id.* at 680.

> Given the constitutional mandate that termination of parental rights be carried out only where there is clear and convincing evidence justifying that result, as well as the requirement that termination proceedings and termination statutes be strictly construed in favor of the parent, it follows that—in parental-rights termination cases—Rule 193.6(a)'s exceptions should also be strictly construed in favor of the parents and against the Department. Accordingly, the purposes for that rule must be interpreted in light of the unique character of parental-rights termination cases.

*Id.* at 680–81.

Here, there were conflicting claims among which the trial court was forced to navigate. The Department informed the trial court that it provided its entire case file in discovery. Judy's counsel said she had not received one of the compact disks sought to be admitted by the Department even though the Department's records showed that Judy's counsel had signed for all of the disks. Judy's counsel stated, "I signed for a disk but it was labeled and contained different documents than what everybody else had." The trial court asked Judy's counsel to take the time to look at the allegedly missing documents, but she replied,

> I don't want to look at them. I want them to not be used because I haven't had the opportunity to review them and they haven't been provided to me through

---

[12]"The purposes of Rule 193.6 are threefold: (1) to promote responsible assessment of settlement, (2) to prevent trial by ambush, and (3) to give the other party the opportunity to prepare rebuttal to expert testimony." *D.W.G.K.*, 558 S.W.3d at 680. "Accordingly, in order to establish the absence of unfair prejudice, the party seeking to . . . introduce untimely disclosed evidence must establish that, notwithstanding the late disclosure, the other party had enough evidence to reasonably assess settlement, to avoid trial by ambush, and to prepare rebuttal to expert testimony." *Id.*

discovery. Had I known these documents existed I would [have] never called this witness. That would have completely changed our trial strategy.

After a break, the following transpired regarding the status of discovery:

[BY JUDY'S COUNSEL]: . . . Your Honor. I want to clarify for record purposes and contained in my possession I have 4 disks labeled 4 of 2018 and August of 2018, supplement 5 of 2018 and 8-2-2017. We have conferenced on the issue and after being put into Mrs. Garcia's computer we have found this document in the disks that I have. There is also an additional disk that's been located that has not been reviewed by me. I have not compared that with the disk that I have. It could be identical to the one that I have. It could be different. But it is nonetheless not labelled the same. And there is an additional disk that obviously there's some confusion as to who has what and what it's labeled because everything is labelled differently.

THE COURT: You are using a lot of language that is not very clear. It suggests to me that you have 4 disks in your possession. You're referencing on 1 of those 4 disks you did locate the document that was being referenced by the Attorney Ad Litem.

[BY JUDY'S COUNSEL]: Yes.

THE COURT: But you have a 5th disk that is being referenced and I get the impression it may not have originally been in your possession but it was provided to you today; is that correct?

[BY JUDY'S COUNSEL]: Yes, Your Honor.

THE COURT: So you are wanting to have a chance to review that particular disk to see whether or not the information on it is the same as one of the 4 disks that you already may have which may have been labelled differently and may or may not have the same information on it?

[BY JUDY'S COUNSEL]: Yes.

THE COURT: We have the ability to allow for that. . . . So it appears that the one document that was in question that you did have, the question . . . will become whether or not other documents that the other attorneys want to go into that you may not have yet reviewed. But you need to compare that.

26

Judy's counsel was provided with a copy of the allegedly missing disk. The trial court adjourned on November 7 to allow Judy's counsel time to see whether she had all the documents expected to be admitted at trial. The trial did not resume until November 13, when Judy's counsel raised the objection at issue here.

When Ad Litem 6 was proffered, Judy's counsel objected on the ground that it was contained on a missing disk, prompting the following discourse.

> [BY THE AD LITEM]: My -- for clarification purposes, I don't know what she means by "the disk that was missing." I believe the Department has offered testimony or argument by counsel at least earlier that she signed for that January 15, 2000 [sic] disk. Now, I don't know what [Judy's counsel] did with that disk.

> [BY JUDY'S COUNSEL]: I -- we checked the record. I signed for four disks. There are five total disks within the State's file. So one of the disks that I was not given has this evidence on it. So the fact that neither one of them produced this piece of evidence, which I have now gone through that disk that was missing and located it and know it was one of the ones that I did not receive.

After additional discussion, the trial court learned that Ad Litem 6 was produced to Judy's counsel on November 7.[13] The discussion continued:

> [BY THE DEPARTMENT'S COUNSEL]: Okay. So, then, here's my question. My thought is that the disk was received and you had the opportunity to review them since we broke from Wednesday and today is now Tuesday.

> [BY JUDY'S COUNSEL]: Yeah, that's not the way the law works. That's not the point of discovery. It's to have all of the evidence to prepare a defense to the case.

> . . . .

> [BY THE DEPARTMENT'S COUNSEL]: Well . . . I don't know. I saw that you signed for the disk and I sent out an e-mail [before trial] asking if you had the disk and I did not receive anything saying that you did not have the disk. So I

---

[13]Judy's counsel said, "All of the North Carolina stuff was on the new disk I got."

27

would not have known that you didn't have it. You could have responded to my e-mail and say, this is the one I did not have.

THE COURT: Okay. I'm going to overrule the objection to Attorney ad Litem Exhibit 6 as far as it being based on discovery.

Ad Litem 6 was a three-page safety assessment conducted by the Department in North Carolina. It showed that Ethan's father abused drugs or alcohol and that Judy was instructed to provide proper supervision for the children while she was away at work. The Department testified that it had made its entire file, including this document, available to Judy for her review. According to the Department's records, Judy signed for several compact disks and did not respond to the Department's pretrial letter which identified the disks and requested notification if Judy did not have them. On these facts, the trial court could have determined that Ad Litem 6 was not intentionally hidden, but was not in Judy's possession as a result of a misunderstanding. It was uncontested that the Department believed Judy had Ad Litem 6. Thus, the trial court could have concluded there was good cause for the failure to supplement the discovery to provide a document that it did not know was missing from Judy's possession. Before Ad Litem 6 was proffered, Judy testified about her CPS history in North Carolina, which included neglectful supervision. In light of Judy's testimony, and the fact that counsel had almost a week to review Ad Litem 6 before the trial resumed, the trial court could have determined that Judy was not unfairly prejudiced or surprised by the document's absence.[14]

---

[14]Moreover, Rule 193.6 states that, even if the party seeking to introduce the evidence fails to meet the burden of establishing good cause or unfair surprise, the trial court may temporarily postpone the trial to allow a response to be made or supplemented. Although Judy's brief complains of the lack of a continuance, the record shows that Judy did not request a continuance and previously denied the trial court's offer of a continuance. Additionally, the record established that the Department's discovery response was supplemented on November 7, that trial did not resume until November 13, and that Judy had sufficient time to review the three-page document.

28

We conclude that the trial court did not abuse its discretion in admitting Ad Litem 6.[15] We overrule this point of error.

*(3)      Judy Failed to Preserve for Our Review Her Complaint of Jury Overexertion*

Judy additionally complains that the trial court erred in making the jury hear evidence for over twelve hours when they were allegedly beyond their capacity to retain information. To preserve a complaint for our review, a party must first present to the trial court a timely request, objection, or motion stating the specific grounds for the desired ruling if not apparent from the context. TEX. R. APP. P. 33.1(a)(1). Because the record demonstrates that Judy failed to raise this complaint with the trial court, the issue is not preserved for our review. We overrule this point of error.

We affirm the trial court's judgment.

Josh R. Morriss, III
Chief Justice

Date Submitted:      June 5, 2019
Date Decided:        June 13, 2019

---

[15]Judy also did not brief the issue of what harm, if any, could have come from the trial court's decision to admit the evidence.

29